LOS ALAMITOS SUGAR CO.' et al. v. CARROLL.†

(Circuit Court of Appeals, Ninth Circuit. October 4, 1909.)

No. 1,701.

1. PATENTS (§ 72*)—ANTICIPATION—PRIOR DEVICES.

A device which does not operate on the same principle as that of a patent cannot be an anticipation.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 90; Dec. Dig. § 72.*]

2. PATENTS (§ 72*)—"ANTICIPATION"—PRIOR DEVICES.

It is not sufficient to constitute anticipation that the devices relied upon might, by a process of modification, reorganization, or combination, be made to accomplish the function performed by the device of the patent.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 90, 91; Dec. Dig. § 72.*

For other definitions, see Words and Phrases, vol. 1, p. 411.]

3. PATENTS (§ 174*)—IMPROVEMENT PATENTS—OPERATIONS OF DEVICE.

A patent expressly for an improvement on the device of a prior patent to the same inventor should be read in connection with the first, and will not be declared void because, standing alone, it does not describe an operative apparatus.

[Ed. Note.—For other cases, see Patents, Dec. Dig. § 174.*]

4. PATENTS (§ 328*)—VALIDITY AND INFRINGEMENT—LOAD-DUMPING APPARATUS.

The Carroll patent No. 561,485, for a load-dumping apparatus, claims 1 and 2, which cover a combination of elements in an apparatus especially designed to dump wagon loads of beets, and which is highly successful in accomplishing such purpose in much less time than required by any previously known means, were not anticipated, although the elements of the combination were separately old, and disclose invention. Patent No. 595,-236 to the same inventor for an improvement on the apparatus of the prior patent also *held* valid, and both *held* infringed.

[Ed. Note.—For other cases, see Patents, Dec. Dig. § 328.*]

5. PATENTS (§ 312*)—SUIT FOR INFRINGEMENT—LACHES.

The defense of laches to a suit for infringement of patents *held* not sustained by the evidence.

[Ed. Note.—For other cases, see Patents, Dec. Dig. § 312.*

Laches as defense in suits for infringement, see notes to Taylor v. Sawyer Spindle Co., 22 C. C. A. 211; Richardson v. D. M. Osborne & Co., 36 C. C. A. 613.]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes.

† Rehearing denied.

Appeal from the Circuit Court of the United States for the Southern District of California.

Suit in equity by Timothy Carroll against the Los Alamitos Sugar Company and another. Decree for complainant, and defendants appeal. Affirmed.

Miller & White and Lawler, Allen, Van Dyke & Jutten, for appellants.

Frederick S. Lyon, for appellee.

Before GILBERT and ROSS, Circuit Judges, and HUNT, District Judge.

ROSS, Circuit Judge. This suit was brought by the appellee in the court below for the alleged infringement of certain letters patent issued to him, the first of which was for a load-dumping apparatus, numbered 561,485, and dated June 2, 1896, and the second of which was for alleged improvements therein, numbered 595,236, and dated December 7, 1897.

The complainant, who is the appellee here, alleged infringement of claims 1 and 2 of the first patent, and of claims 1, 6, and 7 of the second. The defendants denied any infringement, and also set up in defense anticipation and lack of invention, laches, and also that the second patent was void on the ground that it does not disclose an operative apparatus.

In this court the appellants moved, and the appellee consented to, the dismissal of the cause as to the appellant Clark, and an order to that effect was entered.

In the specification of the first patent Carroll said:

"In Southern California the raising and shipping of beets for manufacturing sugar requires the rapid unloading of large numbers of wagon loads of beets, for the reason that the beets must be weighed and sampled by the sugar manufacturers, and it is impracticable to unload except at the place where the sampling is done, because the samples must be taken at the time of unloading each load in order to get a fair average of the load. In order to handle these beets it has heretofore been customary to place a net in the wagonbed and to then load the beets upon the net, and at the place of unloading the net was lifted by a derrick and the load drawn out of the wagon and brought over the car, and one side of the net then released; but this system was not sufficiently rapid, and great inconvenience and delay resulted, it frequently occurring that 30 teamsters would have to leave their wagons loaded all night and wait their turn next morning to unload. One object of my invention is to avoid all this inconvenience and loss of time, and to provide means whereby a farm wagon loaded with beets can be dumped in a very short period of time. With my invention as high as 27 wagon loads of beets, weighing in the aggregate nearly 40 tons, have been dumped from one dump into railroad cars, thus loading 2 cars, in 30 minutes. The actual work of dumping a 4-horse wagon load of 5 tons can be done easily in half a minute. In practice I have found 30 seconds to be sufficient for dumping the load after the wagon has stopped in place on the dump platform. My invention relates more particularly to the appliances and combinations of parts by which I am enabled to so rapidly unload heavy and light wagons loaded with beets. It is very important that the apparatus shall work rapidly, that the team remain hitched to the wagon during the dumping, that the apparatus be so constructed and arranged that the wagon can be jolted, if required, to jar loose any beets that do not readily slide out of the wagon bed, and that the parts be so arranged that the wagon can be easily and quickly put into shape to be driven away as soon as the load is

dumped. A further and very important consideration is to so construct and arrange the apparatus as to avoid any injurious strain on the wagon, and a peculiar and valuable feature of my invention is that I dump the load sidewise and fasten the vehicle to the tilting support by a chain or other suitable tie extending between and fastened to the tilting support and the bed of the vehicle. By this feature I make it possible to rapidly dump the load and not rack the wagon. In fact, by reason of this arrangement, the operation of dumping a load from a wagon does not rack or strain the vehicle in any part, except that strain comes upon that part of the bed to which the chain is fastened, and that part of the bed can easily be made strong enough to withstand the strain. No severe strain comes on the running gear, and this is of great importance. So far as I am aware, in all other appliances proposed for dumping wagons the vehicle is to be held by the running gear, and such appliances are not adapted for the work which my apparatus does. It is an object of my invention to accomplish the desired work of unloading wagon loads of beets as above stated, and to do it without straining or racking the wagon. This I have fully accomplished by my new invention. My invention is also applicable for dumping car loads of beets, and is also adapted for dumping from cars, wagons, and other vehicles bulk loads, such as coal, corn, etc., in loading vessels and for other purposes. My invention comprises the combination of a tilting vehicle support for the loaded vehicle, pivoted longitudinally to tilt sidewise, a longitudinal axis upon which the vehicle support is pivoted, means fastened to the tilting support and to the bed of the vehicle for holding the vehicle on the vehicle support, a lever for tilting the vehicle support sidewise and returning it to its horizontal position, a team support at the front of the vehicle support, on which the team can stand hitched to the vehicle while it is dumping, and a stop arranged to stop the tilting support on a slant and prevent it from tilting far enough to materially interfere with the team hitched to the vehicle. It also includes the vehicle support and various parts and combinations of parts hereinafter more fully specified. My invention also comprises the combination of a vehicle support arranged to tilt sidewise, a vehicle having a bed provided with a hinged side, and adapted and arranged to allow its load to be dumped off sidewise, and means extending between and fastened to the tilting support and the vehicle bed for holding the vehicle on the vehicle support when it is tilted, a lever fastened to and projecting from the side of the tilting support opposite that toward which the support tilts, and the stop arranged to stop the support when it has tipped sufficiently to cause the load to slide off sidewise. This is applicable either for railway cars, wagons, sleds, or any vehicle having a bed from which a load can slide sidewise when the vehicle is tipped. A distinctive feature of my invention as applied to wagons is the hinged side of the bed arranged wholly above the wheels and the dumping of the vehicle sidewise and stopping the tilting support on an incline, and thus dumping a large load without the necessity of unhitching the team, for by this means I avoid all the necessity of backing and of all other slow or complicated ways or means for dumping the load, which are necessary and which consume time in the case of wagons that dump endwise. By tilting the wagon sidewise I have made it much easier, quicker, and less expensive to unload the loads than is possible by any other means heretofore known. The driver of the team can drive across the tilting support and stop with his team upon the team support, and the dumpman can then dump the load while the team is hitched thereto, and the teamster can then drive on at once, so that there is but little stoppage of the team to dump the load. In carrying out my invention for dumping a wagon load of beets I raise the wagon bed above the wheels and arch the floor over the hind wheels, and I provide the wagon bed with a drop side, and provide such drop side wholly above the wheels with supports to hold it extended from the bed when dropped, so that the drop side serves as an apron to shoot the load onto the stationary apron which is provided at the side of the dump to shoot the load into the car."

The applicant then set out drawings illustrating the alleged invention, with specific descriptions thereof, and made five claims, the first and second of which are as follows:

"(1) The combination of a vehicle support arranged to tilt sidewise; means for tilting the support and returning it to a level position; a stop arranged to stop the support on a slant; a vehicle having a bed provided with a drop side wholly above the wheels and adapted to allow its load to be dumped off sidewise; means extending between and fastened to the tilting support and the vehicle bed for holding the vehicle on the vehicle support when it is tilted; a latch for holding the drop side in place and adapted to be released when the wagon is tilted; and means for supporting the drop side when it is dropped.

"(2) The combination of a vehicle support arranged to tilt sidewise; means for tilting the support and returning it to a level position; a stop arranged to stop the support on a slant; a vehicle having its bed adapted to allow its load to be dumped off sidewise; means extending between and fastened to the tilting support and the vehicle bed for holding the vehicle on the vehicle support when it is tilted; and a team holding support arranged at the front end of the tilting vehicle support and independent thereof, and adapted to allow the team to stand thereon hitched to the vehicle while the vehicle is being dumped."

It is manifest, we think, that these claims are limited to the dumping of wagons; and it is so conceded by the counsel for the appellee. The great usefulness of the appellee's apparatus cannot be doubted, for the importance and magnitude of the sugar-beet industry is not only a matter of common knowledge, but is also shown by the evidence, which further shows that prior to it the beets were unloaded from wagons either by means of forks and shovels, or by nets first placed in the wagons upon which the beets were loaded, and then unloaded at the desired place by means of hooks, ropes, chains, and whims operated by horses, all of which processes were more or less slow and expensive. Carroll's conception included the novel idea not only of dumping the wagons without unhitching the horses, thereby materially saving time and labor, but also the use of a part of the wagon as a part of the dumping apparatus. The conception was decidedly novel and valuable. While none of the elements employed by him were new, and while there was nothing new in the mere idea of dumping loads from cars, wagons, and other vehicles by tilting the vehicle sidewise and thereby causing its load to slide out by gravity, there is nothing in the record tending to show that anybody else had ever before thought of so unloading a wagon while the horses remained hitched to it, nor of the novel, expeditious, and highly successful manner employed by Carroll. The evidence is abundant, and without contradiction, to the effect that with Carroll's apparatus loads are readily dumped in 30 seconds, as against from 10 to 20 minutes by even the net and whim process, to say nothing of unloading with shovels or forks. In sustaining a patent for improvement in looms for weaving pile fabrics, consisting of such a new combination of known devices as to give a loom the capacity of weaving 50 yards of carpet a day when before it could only weave 40, the Supreme Court said, in the course of its opinion in Loom Company v. Higgins, 105 U. S. 580, 591 (26 L. Ed. 1177):

"It may be laid down as a general rule, though perhaps not an invariable one, that if a new combination and arrangement of known elements produce a new and beneficial result, never attained before, it is evidence of invention. It was certainly a new and useful result to make a loom produce 50 yards a day when it never before had produced more than 40; and we think that the combination of elements by which this was effected, even if those elements were separately known before, was invention sufficient to form the basis of a patent."

Beet wagons are necessarily heavy and stout, although of variable capacity, usually carrying, according to the evidence, from 4 to 7 tons at a load. The great desideratum was to shorten the time required for the unloading of the wagons, and thereby, incidentally, to save cost. The successful carrying out of the idea necessarily involved the safety of the vehicle as well as of the team attached thereto. Carroll's conception was to dump the loads from the wagons without unhitching the horses, so that the teams might at once go for another load; and to accomplish this without the use of power. He seems to have so combined old elements as to produce the desired result without the use of other power than the coacting of the various parts. He provided a raised platform of a height sufficient for the dumping of the beets from the wagon into the car or bin below, with an upward approach for the driving of the team with the loaded wagon onto the platform, and a descending roadway for the departure of the team with the empty wagon after the discharge of the load. That portion of the platform on which the wagon rests while the load is being dumped was so arranged as to tilt, while the portion upon which the horses stand during the tilting process remains fixed. That portion of the platform on which the wagon rests while the load is being dumped was so arranged as not only to tilt, but to stop tilting at such an angle as to discharge its loads without interfering with the position of the wagon itself or of the horses, and so that the wagon might be brought back into position to be driven away, and the apparatus brought into position for the receipt and discharge of the next succeeding loaded wagon—one of the functions of the stop being to give the load a jolt so as to insure its complete dumping. The tilting platform was so counterbalanced that the weight of the load would automatically carry the platform and load down, and when the load was discharged the counterbalance would automatically bring the platform back to its horizontal position. The wagon bed was so arranged as to permit all the beets to slide out of it when the proper angle in the tilting process was reached, and in order to prevent any of the beets during that process from rolling onto the surface of the tilting platform or underneath the dump instead of into the car or bin, as the case might be, the wagon bed was provided with a drop side wholly above the wheels to serve as an apron to shoot the load sidewise into the car or bin. Chains were provided extending from the tilting platform to the wagon body for holding it on the platform when tilted; a latch for holding the drop side of the wagon up during the loading of the beets and their hauling to the dumping apparatus and adapted to be released when the wagon load is on the platform and the dumping operation is to take place. The record shows that the various parts of Carroll's device were so interrelated and so coacted as to bring about the desired result in an eminently successful and satisfactory manner, and we see nothing in the record to show that any other device or apparatus ever before operated upon the same principle in accomplishing the same or a similar result. A device which does not operate on the same principle cannot be an anticipation. Western Electric Company v. Home Telephone Company (C. C.) 85 Fed. 649; Dederick v. Cassell (C. C.) 9 Fed. 506; Pattee v. Moline Plow Company (C. C.) 9 Fed. 821; Fuller v. Yentzer,

94 U. S. 288, 24 L. Ed. 103; Topliff v. Topliff, 145 U. S. 156, 12 Sup. Ct. 825, 36 L. Ed. 658; Robinson on Patents, vol. 1, § 282; Walker on Patents (4th Ed.) § 62.

We do not think it necessary to refer specifically to the large number of patents set up as anticipatory. The one apparently most relied upon is that issued to Chisholm, which was for "certain new and useful improvements in the mode of dumping railroad cars." There the cars to be dumped were placed on a railroad track pivoted longitudinally to a platform arranged to tilt sidewise in either direction, with a supplemental rail so provided as that, when the platform is titled, the inside of the flange of the upper wheel will press against it and release the strain from the flange of the lower wheel, the means for which tilting consisting of a windlass and a chain attached to the sides of the platform—the car having hinged sides arranged to be lifted upward. The sides of the car were also connected by chains with the sides of the tilting platform, so as to prevent the car from falling off the tracks when it was tilted sidewise, and posts were placed at the side of the track against which the car strikes when tilted, and which stop it. Expert witnesses for the respective parties—Boyd and Bates—seem to agree in their opinion that the principle of operation of the Chisholm device is different from that of Carroll, and, without going into details, we think it sufficient to say that the Chisholm patent does not anticipate all of the elements found in the claims of the Carroll patent hereinbefore set out, and that it is not capable of being operated or used in the manner in which Carroll's device was intended to be operated and used. Nor do any of the other patents relied upon provide a complete dumping apparatus which will operate upon the principle of Carroll's. It is not sufficient to constitute anticipation that the devices relied upon might, by a process of modification, reorganization, or combination with each other, be made to accomplish the function performed by the device of the patent sued on. Authorities supra.

The second patent issued to Carroll was for improvements to the apparatus patented to him by his first patent, consisting of a wheel-holding device for preventing the slipping of the vehicle on the tilting platform while being tilted, and consequent injury to the wagon. It was thus described in the specification:

"My invention includes in a dumping apparatus for dumping a vehicle sidewise a holder carried by the tilting vehicle-supporting platform at a height to engage the hubs or ends of the axles of the vehicle, and means for moving the holder to and from the hubs or axle ends, so that when the vehicle is moved onto the tilting platform the holder can be moved against the hubs or axle ends on the side toward which the platform tilts, and then when the platform is tilted the sidewise strain is borne by the axles, and lateral movement of the vehicle is prevented. Then, when the vehicle has been emptied and returned to upright position, the holder can be moved away from the hubs or axles ready for another vehicle. I have found by practical tests that this holder, carried by the tilting vehicle-supporting platform and brought against the ends of the axle or against the hubs of the wheel, is perfectly effective for holding the vehicle during the dumping process, and this application of the holder is far superior to holders which apply against the bed of the vehicle to support the bed, for the reason that the movement of the holder into its supporting position and out of the path of the vehicle is much less with wagons than is necessary where the holder is made to engage the vehicle bed, and the holder

is brought closer to the tilting platform and therefore can easily be given the required strength without being made cumbersome, and is nowise in the way of the dumping load, but is entirely below the vehicle bed and the path of the load as it passes out of the vehicle."

The inventor further said in the specification:

"I have set forth the best form in which I propose to carry out my invention, but I do not limit myself to the exact form shown, as it is obvious various modifications can be made without departing from the spirit of my invention."

We think, as did the Patent Office, that the second patent should be read ·in connection with the first, and that, as so read, it is not, as contended by the appellant, void on the ground that it does not describe an operative apparatus.

The court below found infringement upon the part of the appellant, and we think the evidence in the cause sustains that conclusion. The testimony of the witnesses Francis M. Townsend, Howard E. Powell, William N. Olmsted, and L. G. Bodine strongly supports it, and it also finds support in the fact that the evidence shows that the manager and the constructor of the appellant's factory knew of the Carroll apparatus, discussed it, and that its builder, Edward F. Dyer, before building the appellant's dumping device, several times examined that of Carroll, and made at least some notes and drawings of it. We extract from the testimony of the witness De Voe:

"Q. Who was the general superintendent for the erection of the Los Alamitos Sugar Company's plant and dump? A. Mr. E. F. Dyer. Q. Did you at any time have any talk with Mr. E. F. Dyer with regard to the Carroll dump which was erected at Anaheim? A. I did. Q. State the circumstances of such conversation. A. I was filling the foundation for the sugar house, and Mr. Dyer came over and asked me what I knew about the construction of the dump over at .Anaheim. I told him I didn't know much about how it was constructed, but the man who was working for me, with me, Mr. Hiss, had assisted in building it and run it for a couple of years, and could tell him more than I could. Q. Prior to this conversation had there been any dump erected at the Los Alamitos Sugar Factory? A. There had not. Q. State whether or not you knew whether Mr. Edward F. Dyer went over to Anaheim in 1897 to examine the Carroll dump. A. He did. Q. How do you know he did? A. He hired me to take him there. Q. Do you know of your own knowledge whether Mr. Edward F. Dyer made any examination of the Carroll dump at Anaheim? A. I do. Q. What did he do? A. He went under the dump and looked at it; had a shingle, I think, with a paper on it, and made some drawings. Q. Did you have any conversation with him at that time? A. I did, a few minutes after that. Q. What was it? A. We left the dump and started up town, and I laughed at him and asked him if he was going to steal the Irishman's dump. He said he didn't know as there was anything to steal; he had ideas of his own."

The witness Hiss·testified, among other things, as follows:

"Q. Are you acquainted with Edward F. Dyer? A. Yes, sir. Q. Do you know what connection he had in 1896 with the Los Alamitos Sugar Company? A. Yes, sir. Q. What was it? A. He had charge of the building of their factory, erecting the factory at Los Alamitos. Q. Did you have any conversation with him during the year 1896? A. Yes, sir. Q. State where and when and what that conversation· was about. A. Why, he come there to the dump where I was at work, and there wasn't any teams there just at the time, and he asked me if I had any objection to him looking over the dump and taking some measurements, and I told him I didn't. So I went down off the dump with him and helped him to take some measurements, which he noted down in a book, or a shingle—I can't remember exactly which. He had something,

either a shingle or a book, which he made some datas on, and, before we got through with the measurements that he wanted to take there was some teams come up to the dump and I had to go up to attend to my duties, and I paid no more attention to just how long he was there. He was there 15 or 20 minutes, around the dump. Q. Did you have any conversation with him in regard to beet-dumping apparatus? A. Yes, sir. Q. What was it? A. Well, he asked me what I thought would be the most advisable plan for the factory at Los Alamitos, the net or a dump, and I told him by all means the dump. Q. What dump were you and Mr. Dyer referring to in that conversation? A. Well, the Carroll dump was the only one that was in existence that I knowed anything about at that time. Q. Did you ever have any conversation with Mr. Edward F. Dyer at Alamitos in regard to dumps? A. Yes, sir. Q. What was that? A. Well, I was helping to do some grading work there, and of course he knew that I had a great deal of experience in the dumps and helping to build the Carroll dump, and he asked me quite a number of different questions in regards to the width of the dump and the bins. He also knows I have had experience in Chino. And had several conversations in general which I cannot say exactly what the—word for word what they was, but it was generally in regards to the dump. I helped to do the grading there at the factory in the fall of 1896. Q. That was prior or after the dump was erected at the Los Alamitos Sugar Factory? A. That was before the dump was erected."

We cannot see that the court below erred in ruling against the appellant's plea of laches. No question in respect to profits or damages is involved on this appeal, the question of the appellee's right to the injunction awarded only being involved. The record shows not only that the contractor employed to build the appellant's dumping apparatus made several examinations of that of Carroll, taking some notes and drawings thereof before undertaking to construct the appellant's device, but that the manager of the appellant company had also a talk with Carroll in respect to the latter's apparatus, and that the manager, on the 12th of June, 1897, was notified in writing by Carroll of the issuance to him of his letters patent, and was expressly warned against infringing upon them. Carroll also testified that prior to the commencement of the suit he had a conversation with the manager of the appellant company on the street in Los Angeles, in which, said the witness:

"I told him that he had infringed on my patent, and he told me that he would be willing to pay me a nominal sum. I told him no, I wouldn't accept a nominal sum; that he could have it at a royalty at a cent per ton. He said if I wouldn't give it to him at a nominal sum he would take it. I told him positively, 'If you will take the dump and put it away from me, you will do it over my dead body. I will defend myself.'"

The record also shows that Carroll employed an attorney to bring suit against the appellant, for a contingent fee, that the matter was in the attorney's hands for a good while, and that the attorney finally died without bringing the suit, and that subsequently, when Carroll got sufficient money to commence action, he instituted the present suit.

Upon the record we do not think that it can be fairly said that there was any acquiescence upon the part of the appellee in the appellant's infringement, or that the circumstances are such as in equity bar the action.

The judgment is affirmed.