## UNION TOOL CO. v. WILSON & WILLARD MFG. CO.

(District Court, S. D. California, S. D. June 20, 1916.)

No. 1540.

1. PATENTS ☞36—EVIDENCE OF INVENTION—COMMERCIAL SUCCESS.
   Great commercial success in the case of a tool largely used, together with the presumption arising from the grant of a patent, are sufficient to establish invention in case of doubt.
   [Ed. Note.—For other cases, see Patents, Cent. Dig. § 40; Dec. Dig. ☞36.]

2. PATENTS ☞328—VALIDITY AND INFRINGEMENT—UNDERREAMER.
   The Double patent, No. 734,833, for an underreamer, for use in the drilling of oil and gas wells, was not anticipated, discloses invention, and covers a combination of decided merit, which is entitled to a fair range of equivalents; also *held* infringed.

3. PATENTS ☞68—ANTICIPATION—PRINTED PUBLICATION.
   A trade catalogue containing a cut of an article is not such a publication as will anticipate a subsequent patent.
   [Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 82, 83; Dec. Dig. ☞68.]

4. PATENTS ☞240—INFRINGEMENT—EFFECT OF IMPROVEMENT.
   An improvement on a patented article, where the principle of operation is not changed, will not avoid infringement.
   [Ed. Note.—For other cases, see Patents, Cent. Dig. § 379; Dec. Dig. ☞240.]

5. PATENTS ☞236—INFRINGEMENT—CHANGE OF FORM.
   Change in form alone, unless it substantially changes the method of operation, is not sufficient to avoid infringement.
   [Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 372, 373; Dec. Dig. ☞236.]

In Equity. Suit by the Union Tool Company against the Wilson & Willard Manufacturing Company. On final hearing. Decree for complainant.

Frederick S. Lyon, of Los Angeles, Cal., for complainant.
Raymond Ives Blakeslee, of Los Angeles, Cal., for defendant.

CUSHMAN, District Judge. Complainant sues for the infringement of letters patent No. 734,833, applied for in 1901 and granted Edward Double in 1903. The patent is for a new type of underreamer covering certain combinations therein. The defense is: Want of patentable novelty and invention; anticipation, and infringement is denied.

In drilling oil wells in Pennsylvania, no underreamer was necessary, as the formation stood up, and, when the rock was reached, at a depth of 50 to 100 feet, no casing was required; casing being a pipe entered in the hole for the purpose of holding back soft earth and preventing caving. The devices in question are a part of what is known as the "cable tool system" of oil well drilling, consisting of a high derrick with windlasses, called "bull wheels and calf wheels," for winding up and releasing the cable rope to which the tools are attached. · The hole in the ground is made by dropping a string of tools. A certain amount of water is kept in the bottom of the hole, which is churned up into mud. This mud—made by the water and detritus formed by the drilling—is taken out of the hole by a baler or other suitable device, which is run down inside the casing.

In drilling, ordinarily, a heavy bit is used. The bit will pass literally through the inside of the pipe; but, in playing up and down beneath the pipe, unless the formation is soft, it will cut a smaller hole than the outside diameter of the pipe or casing. In hard formations it is therefore necessary that the hole underneath the casing be enlarged, or underreamed; that is, reamed out under the casing, so that the casing may follow through the hole. The device for accomplishing this is an underreamer, which, in effect, is an expansive bit that is so arranged as to expand after it has been dropped through the casing. The casing is supported a sufficient distance above the underreamer to allow of its being played up and down to cut away the hard strata by the weight behind the striking bit.

The ordinary drilling bit drills a hole through the hard ledge first, but this hole is of too small a diameter to permit of the passing of the casing. The hole is then enlarged by means of the underreamer, so that the casing may fall. In order to be a successful underreamer, the machine must be essentially strong. The thrust upon the bit must be as nearly as possible in direct line with the string of tools to prevent breaking. The mechanism by which it expands and collapses must be dependable, so as not to get out of order by reason of the heavy blows, or by reason of the mud and débris in which it has to be worked. It must not only be so arranged as to expand when it is passed down through the casing, but provision must be made by which, in pulling it up against the shoe or foot, of the casing, it will again be collapsed, so that it can be drawn within the casing.

These are the main difficulties to be overcome in such a device, and the accomplishment of them—as the evidence shows—has been sought for many years. The drilling of oil wells in California began as far back as about 1890. The industry increased to a great degree in importance about 1897. Prior to the invention of the patent in suit, the underreamers mainly used in California oil fields were known as the "Austrian" and "Russian." With these a greater depth than 1,800 feet was seldom reached. By the use of the Double underreamer a much greater depth was attained, not infrequently twice as deep as formerly.

[1] It is claimed that this great success was not entirely owing to the new underreamer, as improvements in other oil well drilling de-

vices were adopted about the same time. It is clear that much of the credit for this great accomplishment is unquestionably due to the Double underreamer. It almost at once took the lead in the oil well tool trade over all former reamers. There is testimony that, in the California fields, 85 per cent. of the underreamers sold are either of the Double type or that of the alleged infringing device. These facts, coupled with the presumption arising upon the grant of the patent, are sufficient to resolve any doubt, which may exist in this case, in favor of the validity of the patent. Stebler v. Riverside Heights Orange Growers' Association, 205 Fed. 735, 124 C. C. A. 29; Morton v. Llewlyn, 164 Fed. 693, 90 C. C. A. 514.

[2] It is not meant by this that patentable invention is left substantially in doubt upon an inspection of the alleged anticipating devices and the evidence concerning them, for it is not. Upon the trial, defendant sought to establish that one Frederick W. Jones—an employé of the National Supply Company, under the superintendency of Double—was really the inventor of whatever was novel in the patent in suit. Jones testified that he was, in fact, the inventor; but his former conduct, his long silence, even under provocation, and testimony given by him on an interference contest in the Patent Office involving the Double underreamer, are wholly inconsistent with his present statements. The testimony at that hearing was given about the time of the granting of the patent in suit, and was, in part, as follows:

"Q. Did you have a conversation with Mr. Double in regard to this reamer? and, if so, state the conversation. A. Well, I was employed by Mr. Double at the same time he was manufacturing the reamer in question. I had a conversation with him, and he said the reamer was a mean thing to manufacture and that he would change the construction of it, and he showed me what changes he proposed to make, and he also asked me what I thought of the changes, and I told him that I thought the change was a good one. That is all."

This so far discredits the testimony of Jones as to leave no warrant for overthrowing the presumption of regularity in the issuance of the patent, as well as plaintiff's evidence now given in support of the patent.

The main question in the case is: What range of equivalents, if any, is complainant entitled, under the patent in suit, to be protected against? Upon consideration of the prior art, including the alleged anticipating patents and devices, and the marked success in the trade and in operation of the Double underreamer, I find that it constituted combinations of decided merit, entitling complainants to a fair range of equivalents. Los Alamitos Sugar Co. v. Carroll, 173 Fed. 280, 97 C. C. A. 446. While it is true that each of the elements of the combination claims of the patent in suit were old in the art, yet the combinations, as a whole, were new. The claims of the patent in suit in question are numbered 1, 2, 6, 7, and 8, and read as follows:

"1. An underreamer comprising a hollow mandrel furnished with an internal shoulder, a downward extension having opposite parallel bearing faces having a keyway therein, shoulders at the sides of such extension, and upwardly and inwardly sloping dovetail slipways beneath said shoulders; a

spring on the shoulder in the hollow mandrel; a rod playing in the mandrel furnished with a key seat and supported by the spring; dovetail tilt slips playing in the slipways and furnished with key seats respectively; a key in the key seats of the slips and rod and playing in the keyway of said extension to hold the slips against the shoulders; said slips being furnished with inward projections to slide upon the downward extension of the mandrel to spread apart the cutting edges of the slips when the slips are drawn up.

"2. An underreamer furnished with a mandrel having a downward extension provided with opposite parallel bearing faces and a keyway in the extension; a spring-supported rod furnished with a key seat and playing up and down in the mandrel; tilt slips slidingly connected with the mandrel and furnished with inward projections to slide upon the opposite bearing faces of the downward extension to spread the slips apart at the lower ends when the slips are drawn up; and a key carried by the rod and carrying the slips."

"6. In an underreamer, a mandrel furnished with a hollow slotted extension, the lower end of which slopes upward at the edges; tilt slips slidingly connected with the mandrel and furnished on their inner faces with projections, the upper faces of which slope downward to slide upon the extension of the mandrel; and means connecting the slips with the rod.

"7. In an underreamer, the combination with a hollow mandrel, provided with a slotted extension, a spring-actuated slip-operating rod provided with a pivot key, tilt slips provided with key seats adapted to be engaged by said pivot key, said key seats being somewhat larger than the key to allow the slips to tilt, said slips provided with inwardly projecting shoulders, and said slotted extension provided with surfaces adapted to tilt said slips and hold the same in expanded position.

"8. In an underreamer the combination of a hollow mandrel with a hollow slotted extension, said extension having opposite parallel bearing faces, a slip-carrying rod in said mandrel, slips connected to said rod, said slips having projections which bear against said extension, said slips being provided with key seats, a key carried by said rod, each end of the key lying in a key seat of a slip, and the key seat in each slip being somewhat larger than the key to allow the slips to partake of a tilting action."

A hollow mandrel with inner shoulder, a downward extension with shoulder at the side of the extension, a spring on the shoulder in the hollow mandrel, a rod playing in the mandrel supported by the spring, and a key at the lower end of the rod to carry the cutters, were, in such combinations, all old in the art. The chief novel feature of the Double invention was the tilting means adopted for the collapse and expansion of the cutters—in combining that means with interrelated dovetails on the cutters and ways of the body extension.

In the O'Donnell & Willard patent (No. 762,435), while there may be a slight tilt of the cutters, owing to the downward and inward inclination of the interposed section of the body and the fact that, in operation, the bottom of the machine would be full of fragments of rock and other material removed in the progress downward, as well as the interior of the bowl shape of the lower body, the action of the cutters on the key would be *sliding*, rather than *tilting, rocking*, or *swinging*.

In the O'Donnell & Willard patent and device the face of the interposed part of the body upon which the cutters travel has but one incline, though tending to curve. The collapse of the cutters is therefore gradual, while in the patent in suit the bearing faces upon which the cutters travel are at first parallel, until the shanks are well free from their seats, when in operative position, the collapse is then sudden, to which a tilting or swinging action on the key is necessary. The

same distinction is to be found in the so-called "Jones round-nosed" reamer.

In the O'Donnell & Willard device, while there are seats in the cutters for the insertion of the key, carried by the spring actuated rod, the periphery of the body is unbroken. While, in the patent in suit, the pocket in the body in which the shank of the cutter becomes seated opens to the outside, permitting the shoe of the casing to contact with the shoulder on the outside of the cutter shank above the lower end of its head or body, and also allows of stronger body construction. The dovetails upon the shanks of the cutters and ways, therefore, are not found in the O'Donnell & Willard patent and device.

The so-called "Jones round-nosed" reamer was a device for which no application was ever made for patent. It never was used, and was abandoned by Jones. In the Jones round-nosed reamer, the entire movement of the cutters is directed by a dovetail structure, the ways being curved inwardly and downwardly, effecting a collapse; but the method of operation is entirely different in this respect from the patent in suit. There is no spreading bearing in the Jones round-nosed reamer to assist in the expansion and collapse of the cutters.

These differences in the mode of operation appearing in both the O'Donnell & Willard device and that of the Jones round-nosed reamer render it unnecessary to consider further whether there should have been an interference proceeding in the Patent Office as between O'Donnell & Willard and the Double applicants, or to consider whether the Jones round-nosed reamer preceded Double's invention, and whether Double was familiar with it.

In the Swan reamer (No. 683,352) there are interrelated dovetail ways upon the body of the reamer and interrelated dovetails upon the cutter, which dovetails and ways, likewise, appear in the patent in suit. But the action of the cutters in the Swan device are entirely of a sliding character. There is no swing or rock, either upon the key or the shoulders or exterior angles in the lower end of the body as in the patent in suit.

In the North patent (No. 674,793) the action of the cutters is entirely a rocking action upon the key and upon each other. There is no interposed portion of the body, and the only portion of the cutters sliding is in their upper extreme contact with the inside of the bowl formation in the bottom of the reamer body.

The Brown reamer (No. 687,296) is doubtless the closest in essential principle of anything in the prior art to the patent in suit, for the cutter is adapted to both slide upon an interposed portion of the body, provided with parallel bearing faces for that purpose, and, as the cutters slide down upon this face, they collapse inwardly over the lower end of the extension, which they are enabled to do directly because of the fact that the cutters, on their inside faces, are provided with a recess for the accommodation of the enlarged lower end of the body, and they are further so enabled to collapse because they hang free upon a spring-actuated device in the interior of the reamer. But they are suspended, not by means of a key seat in a recess in the shank of a cutter larger than the key, as in the patent in suit, but the upper

end of the cutter shank is formed into an inner shoulder hooked over an exterior shoulder upon a spring-actuated box open at the lower end, allowing it to travel downward with the cutters, over an interposed portion of the body. The effect of this difference will be considered later in connection with the rejection of applicant's claim first presented in the Patent Office.

[3] Defendant also avers that a certain Canadian underreamer anticipated the patent in suit. If this Canadian underreamer was patented, the evidence does not disclose that fact. An oil well supply catalogue of 1900 was introduced in evidence, containing a cut of the Canadian underreamer; but such a catalogue is not a sufficient publication to establish anticipation. 30 Cyc. 837, 3-B. There is also some evidence of use in the California fields of this underreamer; but, without undertaking to determine the extent of this use, an inspection of the Canadian underreamer shows that its cutters slide upon the interposed body of the reamer, and are, to a certain extent, allowed to collapse because of inwardly projected shoulders, yet the cutters are not equipped with shanks carrying dovetails, nor the body with pockets to seat such shanks, but the cutters rest upon, and slide entirely without, the body, and are not suspended from a spring-actuated rod in the upper portion of the cutter body, but are locked together and hung on the top of a bolt actuated by a spring in the lower portion of the reamer body, and, as in the Brown device, this spring-actuated bolt, while it carries the cutters as it travels upward, does not, necessarily, do so as it retires downward.

These differences in operation are sufficient to avoid anticipation. None of the underreamers of the prior art combine cutters tilting over the lower end of the reamer body with shanks having dovetails so interrelated with dovetail ways upon the body of the reamer as to afford inner, outer, and lateral bearings when in reaming position.

Claims numbered 1, 2, and 3, as originally proposed, were rejected by the Commissioner of Patents upon reference to the Swan patent, and were only allowed upon their amendment and that of the specifications; the effect of the amendment being to make plain the tilting action of the cutters, or slips, in addition to the interrelated dovetails and dovetail ways thereof upon the cutter shanks and body extension, which latter were found in the Swan device. The effect of the amendment is made plain by an amendment required and made to the specifications and upon which the claims were allowed. This amendment is as follows:

"The sockets or key seats 16 are somewhat larger than the key 17, to permit the slips 15 to partake of a tilting action, the key 17 thus forming a portion, on the rod 11, on which the tilt slips or bits 15 are loosely swung or pivoted, adapting their lower ends to tilt or swing in toward the center of the stock or mandrel portion to pass through the well casing, or to tilt away from the center to assume the proper position for reaming. The tilt slips are provided with shoulders 18 adapted to slide upon a spreading portion provided in connection with the mandrel body."

Claim 7—originally numbered 8—in the application was rejected by the Commissioner of Patents upon reference to the Brown patent. The claim as then presented read:

"In an underreamer the combination of a hollow mandrel, a slip-carrying rod in said mandrel, slips connected to said rod, and means for tilting said slips."

As allowed, it reads:

"In an underreamer, the combination with a hollow mandrel, provided with a slotted extension, a spring-actuated slip operating rod provided with a pivot key, tilt slips provided with key seats adapted to be engaged by said pivot key, said key seats being somewhat larger than the key to allow the slips to tilt, said slips provided with inwardly projecting shoulders, and said slotted extension provided with surfaces adapted to tilt said slips and hold the same in expanded position."

Defendant insists that, by the limitation voluntarily so placed in the claim, infringement is avoided, and that the language of the broad claim, as it originally stood, "and means for tilting said slips," is necessary to cover defendant's device, and, with that language out of the patent, there is no infringement.

In the Brown patent, upon which the claim was first rejected, the means for holding the cutters in expanded position, over which they were allowed to collapse, appear the equivalents of the Double invention; but the means by which the cutters were carried on the rod were essentially different. It is necessary that they be so freely suspended on this rod as to permit them to tilt forward and back, over and upon the lower end of the extension. In the Brown device, this was accomplished by an inwardly projecting shoulder upon the upper extremity of the cutter, fitted or hanging upon a shelf or shoulder extending from the spring-actuated box into the cavity provided for the accommodation of the cutter shank.

In the Double device, the key carried by the rod loosely fits in the hole in the upper part of the inner face of the cutter shank. In operation, as the rod carries the cutters up into the reaming position, the cutters will travel together, for the rod, with the aid of the key inserted in each shank, would control each cutter. But as the box, upon which the cutters hang in the Brown device, travels downward, the cutters do not, necessarily, travel with it, save by their own weight. The expansion on the end of the rod would keep them from falling out, but it would not bring them down with it, together. The foot of the casing, which forces the cutters down in collapsed position, might become jammed out of shape, so as not to be uniform on both sides, or rocks or other substances might get between the foot of the casing and the outer shoulder of the cutter, resulting in one cutter being carried down ahead of the other, if anything interfered with the descent of such other.

This shows such a difference in the method of operation as to prevent anticipation of the Double invention by the Brown. It is therefore obvious that, as Brown invented one "means" and Double another "for tilting the slips," the Commissioner of Patents rightfully rejected Double's broad claim to all means "for tilting the slips," which would have included the means invented by Brown.

The remaining question, whether the means adopted by Wilson of collapsing, expanding, and holding the cutters in reaming position are

equivalents, substantially the same as those of Double, must be resolved in the affirmative. As already pointed out, the chief novelty and utility of the Double invention over the prior art was the combination of the interrelated dovetails on the cutter shank and ways therefor on the body of the extension, with the means by which the tilting action of the cutters over the lower end of the body was accomplished.

It is insisted by the defendant that the complainant is not entitled to protection of this combination under the claims of the patent; that, while claims 1 and 2 cover the dovetail arrangement, and claims 6, 7, and 8 cover the means securing the tilting action, there is no claim covering both. If defendant's assumption were conceded, as long as the lesser combinations were covered by valid claims, no good reason appears—it being found that the entire combination is an invention of decided merit—for allowing only a narrow range of equivalents, although this course might be justified if each of the claims was considered entirely independently of everything else than the prior art.

Defendant's contention in this particular is based on a false premise. Claim 1 covers both the dovetail ways on the body, coacting with dovetails on the slips or cutters, and means for the expansion and collapse of the cutters over the lower end of the extension. The following language of the claim covers the latter feature:

"Said slips being furnished with inward projections to slide upon the downward extension of the mandrel to spread apart the cutting edges of the slips when the slips are drawn up."

It is obvious that, if the cutters spread when drawn up, they would collapse on being drawn down. That this claim not only covers the dovetail slips and ways, but such expansion and collapse of the cutters and the means for its accomplishment, is further shown by the paragraph of the amended specifications above quoted, upon which amendment the Commissioner of Patents allowed claims 1, 2, and 3.

As to claims 1 and 2, it is insisted by the defendant that its forked or pronged formation of the lower extension, rather than the hollow slotted formation of the closed bottom of the patent in suit, and the omission of the opposite parallel bearing faces on such extension, so differentiates the Wilson reamer as to essentially change the mode of operation. The feature of "opposite parallel bearing faces" is only included in claims 1 and 2, and does not appear in claim 3. The opposite bearing faces 9 upon the prongs in the Wilson device are the equivalent of the opposite parallel bearing faces in claims 1 and 2 of the patent in suit. It is true that the former are not exactly parallel, but they are approximately so, and could be made so without affecting, materially, the function discharged by them.

In the patent in suit, the opposite parallel bearing faces extend upward the entire length of the extension to the shoulder that forms the upthrust bearing for the cutters, except as cut to afford a slot for the playing up and down of the key carrying the cutter; thus they form an inner bearing and guide for the upper end of the cutter as

it travels up and down. In the Wilson, these opposite bearing faces are not carried the entire length of the extension. This omission helps to form the pronged formation which enables Wilson to give the end of the rod inserted between the upper cutter shanks a heavier construction, taking on itself the duty before, in part, performed by the upper portion of the opposite parallel faces in the patent in suit. In view of the state of the art, and particularly of the Brown patent and device, I find this would be the substitution of a well-known mechanical equivalent; therefore no avoidance of infringement. The effect of this changed formation, from the hollow slotted extension to the pronged formation is rather to permit of additional features and the accomplishment of further action.

The change permits the cutter shank to collapse between the prongs, which permits of more stock in the cutter shank, eliminating the notch on the inside, which is a feature of the Double cutter, above the inwardly projecting shoulder, which notch in the Double cutter is necessary to allow of the collapse of the cutter over the lower end of the extension, the web of which is unbroken. There is testimony to the effect that this notch constitutes a weakness in the Double cutter.

[4] This provision for the collapse of the cutter between the prongs is the chief additional function accomplished by the pronged formation, although it also permits of the assembling of the reamer from the bottom, instead of the top, and has an advantage in permitting the re-machining of the lower end of the body of the reamer. But these latter features do not affect directly the operation of the machine when in use. These differences may constitute improvements, warranting the issuance of patent; but substantially the same dovetails on the cutters and ways therefor, and like means for tilting the cutters, remain as in the patent in suit. The principle of action, the mode of operation, is not substantially changed, and infringement is not avoided by the improvements. Stebler v. Riverside Heights Orange Growers' Ass'n, 205 Fed. 735, 124 C. C. A. 29; Lourie Imple. Co. v. Lenhart, 130 Fed. 122, 64 C. C. A. 456; Norton v. Jensen, 49 Fed. 859, 1 C. C. A. 452.

Claim 6 reads:

"In an underreamer, a mandrel furnished with a hollow slotted extension, the lower end of which slopes upward at the edges; tilt slips slidingly connected with the mandrel and furnished on their inner faces with projections, the upper faces of which slope downward to slide upon the extension of the mandrel; and means connecting the slips with the rod."

It is insisted by the defendant that further substantially different means are employed in its device from the foregoing. In the foregoing claim the lower end of the hollow slotted extension, it is said, "slopes upward at the edges." This feature is one of the means in accomplishing the tilting or collapsing and expanding of the cutters. In the Wilson reamer, the slopes are at the lower end of each prong, described in Wilson's specifications as "the beveled end faces *17* of the downwardly-projecting lugs *2'*." If the prongs were joined by a web, the formation would, instead of pronged, become hollow and

slotted, and the slopes of the prongs would be "at the edges" of their upward slope.

It is clear that the means and manner of discharging this function are substantially the same in each. Claim 6 further provides that the tilting slips shall be "furnished on their inner faces with projections, the upper faces of which slope downward to slide upon the extension of the mandrel." The projections and sloping faces are numbered *18* and *26* in Figures 9 and 11 of the Double drawing.

Defendant contends that, of the parts in question, the Wilson device has no clear mechanical equivalent for this downward sloping face upon an inward projection. The corresponding part in the Wilson cutter is described in the specifications, and referred to in the drawings as follows:

"The expansion bearing faces *4*³ terminate at their upper ends in rounded corners or bearings *16* to ride more readily over the beveled end faces *17* of the downwardly-projecting lugs *2'* to engage said bearings for expanding the cutters."

The object sought in both formations was to have the cutter slide freely in collapse and expansion up and down over the upwardly and outwardly sloping portion of the body. Infringement could, therefore, not be avoided merely by rounding the shoulders or corners in place of a straight slope, as merely to effect this purpose the rounded shoulders could, not inaptly, be described as "rounded slopes."

[5] It is further contended that the portion of the face of the cutters which corresponds and slides upon the lower part of the prongs is not upon a "projection." Change in form alone, unless it substantially changes the method of operation, is not sufficient to avoid infringement. No citation of authority is necessary in support of this proposition, though there may be an exception, but the exception is not of importance in the present instance.

In one view, the rounded corners are upon the upper face of the projection, for they are on a projection of the body of the cutter, as distinguished from the shank. By the pronged formation, the cutter shank could be made heavier in the Wilson than the Double, and the shank projects still further inward than the projection on the body of the cutter, which carries the rounded shoulder. By cutting away the heavier portion of the cutter shank, permitted by the pronged formation—which elimination would in no way prevent the discharge of the function in question—it becomes clear that the means and function of the parts in question are the same in both devices, although the improvement by the Wilson arrangement may justify a patent to protect the variation.

Claim 7 reads:

"In an underreamer, the combination with a hollow mandrel, provided with a slotted extension, a spring-actuated slip-operating rod provided with a pivot key, tilt slips provided with key seats adapted to be engaged by said pivot key, said key seats being somewhat larger than the key to allow the slips to tilt, said slips provided with inwardly projecting shoulders, and said slotted extension provided with surfaces adapted to tilt said slips and hold the same in expanded position."

Aside from what has already been considered, the only element covered in this claim to be compared with Wilson's device is the "pivot key" with which the "spring-actuated slip rod" was provided, "the key seats" (on the tilt slips) "being somewhat larger than the key to allow the key to tilt." The enlarged key seat in the Wilson is identical with that of the patent in suit. Its function is identical. While the words "pivot key" do not disclose that the key and the rod are separate elements, yet that such was designed by Double is shown by the drawings and specifications. In the Wilson, the rod and key are integral.

While this and the pronged formation of the body extension permit of a heavier and stronger key and cross-head in the Wilson device than the Double, it does not in any way essentially affect the mode of operation by which its function is discharged, in carrying the cutters up and down and in permitting their tilting.

The elements described in claim 8 have been considered in connection with the other claims, and are found to be identical, or the equivalents of like elements in the defendant's structure.

Many lesser matters have been discussed and elaborated upon by counsel, but enough has been said. I deem the lengthening of this opinion further unwarranted.

Infringement of claims 1, 2, 6, 7, and 8 is clear. The injunctive relief prayed will be granted.