M. & B. MFG. CO., Inc., v. MUNK et al.

No. 6903.

District Court, E. D. New York.

March 2, 1934.

Kommel & Rosenberg, of New York City (Morris Kirschstein, of New York City, of counsel), for plaintiff.

John W. Remer, of New York City (C. James Cottrell, of New York City, of counsel), for defendants.

CAMPBELL, District Judge.

This suit is for the alleged infringement of reissue patent No. 18,100, issued to Frederick J. Mersfelder and Paul Balze, assignors to the plaintiff, on June 16, 1931, on application filed February 4, 1931, and coupled with cause of action for unfair competition.

The original patent No. 1,702,878 was issued February 19, 1929, on an application filed May 18, 1927.

A reissue patent No. 17,528 was issued December 17, 1929, on an application filed May 7, 1929.

A second reissue patent No. 17,667 was issued May 13, 1930, on an application filed March 3, 1930.

The patent in suit is therefore the third reissue the application for which was filed within two years after the date of the issue of the original patent.

The plaintiff is a New Jersey corporation, and all of the defendants are citizens of the state of New York; the defendant Paul Munk & Co., Inc., being a New York corporation.

The clean-out plug of the patent in suit has gone largely into commercial use, and from the time of its first introduction to the trade was given a definite name, to wit, "Fit-All" clean-out plug, by which it has become and ever since has been known in the trade. This name "Fit-All" was placed on the commercial product.

The defendants manufacture and sell clean-out plugs for the same purposes but of somewhat different appearance than plaintiff's commercial structure, and have applied the name "Takall" to the alleged infringing plugs.

The defendants have interposed an answer setting up the defenses of invalidity and non-infringement.

The object of the invention is described by the patentees in the specifications as follows:

"This invention relates to improvements in drainage clean out devices and has particular reference to detachable members used in connection with clean outs on drains.

"The ordinary clean out used in connection with drains, consists of a body in the nature of a hollow cylinder of a suitable size, into one end or side of which is fitted, by a screw thread, a brass plug. The body is usually made of iron and is caulked into the hub of the pipe or trap, leaving the brass plug removable for the purpose of cleaning the drain or trap. In many cases the brass plug is lost or broken requiring its replacement.

"Since the threaded portions of the body and plug vary somewhat as to their diameters from other bodies and plugs, it becomes very difficult to obtain the size of the new plug that will properly fit the body. In many cases it becomes necessary to remove the old body from the hub and to replace it with a new body for which the plug is furnished, but this replacement of the new body and plug involves much labor and expense.

"Among the objects therefore of this present improvement is to provide a member such as a plug which will fit into threaded clean-out bodies of various diameters and which consequently will eliminate the necessity for replacing or renewing the body of the clean-out when only a new plug is required. This object is attained by providing, for example, a new plug having a soft metal thread characterized by an excessive taper whereby the plug will fit threaded body openings of substantially varying diameters; and another object is to so form the thread or threaded surface portion of the new plug in an improved manner so that the normal yielding or conforming action of the soft metal may be increased." Page 1, lines 1 to 41.

Of course, the plug must fit tightly to prevent the escape of sewer gas.

The invention met with success.

The patentees organized the M. & B. Manufacturing Company, Inc., and for a time manufactured and sold the plugs; but the demand for them grew so large that it became necessary for the M. & B. Manufacturing Company, Inc., to look for a manufacturer, and it entered into an agreement with the Flemm Lead Company, which had previously been licensed to sell the plug, wherein it licensed the Flemm Lead Company both to manufacture and sell, and that licensee has sold over 100,000 of the patented plugs (Exhibits 5, 8, and 9).

Exclusive sales agreements were granted for Chicago, Detroit, and Buffalo.

The plugs sold were all of the soft metal layer or soft thread type.

The Simplex Manufacturing Company took a license, Bensonhurst Plumbing Supply Company, Inc., consented to a decree in open court upon the day of trial, and Clinton Plumbing Supply Company consented to a decree and paid damages.

The individual defendants herein for a time in 1930 sold what were claimed by the plaintiff to be infringing plugs, but ceased when pressed by counsel for the licensee, by letter dated December 20, 1930 (Exhibit 20).

The defendants Paul Munk and Albert Munk were doing business under the firm name and style of Paul Munk & Co., at No. 36–11 Thirty-Third street, Long Island City, borough of Queens, and state of New York, where the infringing acts complained of were, and at the time of the commencement of this action were being committed.

The defendant corporation was organized by the said Paul Munk and Albert Munk, doing business under the firm name and style of Paul Munk & Co., in January or February, 1933, acquired the assets and assumed the liabilities of said Paul Munk & Co., and took an oral license from a Mr. Wallach and commenced the manufacture and sale of the alleged infringing plugs.

The claims in suit are claims 6 and 7, which read as follows:

"6. In combination, a plug having a tapered threaded outer surface and a member having a tapered threaded opening receiving said plug, said surface having approximately the same number of threads as said member, the taper of the threaded surface of said plug being so substantially different than the taper of said opening, that only a fractional section of the plug is adapted to engage in said threaded opening or in similar threaded openings of various sizes, whereby said plug may be used with members having threaded openings of substantially varying sizes.

"7. A clean-out plug having a threaded outer surface adapted to be engaged with a drainage fitting having a tapered threaded opening for receiving said plug, the taper of the threaded surface of said plug being so sufficiently greater than the taper of said opening that only a fractional section of the plug may be engaged with said opening or with similar threaded drainage openings of various sizes."

These two claims do not require soft metal surface or soft metal thread.

What they do require is (claim 6) a com-bination having a clean-out plug, and (claim 7) a clean-out plug having a taper so much greater than that of the threaded opening of the fitting that only a fractional portion of the plug is engaged with the opening, and the number of threads on the plug being the same as the number of threads on the fitting.

Defendants do not escape infringement by reason of their failure to use soft metal for the plug thread, as that is not mentioned in these claims. It is a feature of other claims, and believing that feature to be of advantage, the patentees, in disclosing as required by statute their preferred form, properly disclosed the use of the soft metal thread, but it is not necessary for the proper functioning of the plug that the metal of the thread be soft. Defendants' plug will function for the purpose but not as well as plaintiff's commercial structure, and it is no defense that defendants do not avail themselves of all of the advantages of the patented structure.

The defendants adopted and used the word "Takall" as a name for their plugs from about the date of the organization of the corporate defendant.

The defendants' Takall plugs are intended for use with standard drainage fittings, that is ferrules, or trap bodies having the standard pipe taper. In them are found the same number of threads as that on the ferrule or trap body, a taper so excessive or so much larger than that of the standard pipe taper of the ferrule that only a small fraction of the Takall plug engages the ferrule.

These plugs it seems clear to me infringe, if claims 6 and 7 of the said patent are valid.

Defendants attack the validity of the reissue patent in suit, on the ground that "it appears clear that there could not be such inadvertence, accident and mistake as to necessitate three reissue patents."

This defense was not pleaded and therefore should not be considered. Wayne Mfg. Co. v. Coffield Motor Washer Co. (C. C. A.) 227 F. 987; Asbestos Shingle, Slate & Sheathing Co. v. H. W. Johns-Manville Co. (C. C.) 184 F. 620, 631.

It is inadvertence to make or accept claims not commensurate with the invention entitling the inventor to a reissue. American Automotoneer Co. v. Porter (C. C. A.) 232 F. 456, 460; Autopiano Co. v. American Player Action Co. (C. C. A.) 222 F. 276.

In any event, the action of the Commissioner of Patents in reissuing the patents is

presumptively correct. Rousso v. New Ideal Laundry Co. (D. C.) 9 F.(2d) 1012, 1013.

There is no allegation or claim of intervening rights in this case, nor do I see how such claim could be made successfully as the first structure sold by the defendants other than the corporate defendant, which the plaintiff claimed infringed, embraced every feature of the patent, including the soft metal for the plug thread, and infringed the claims of the original patent as well as those of the next two reissues.

Furthermore, such defense could not be sustained in equity, as the defendants never made a structure relying upon the claims in the original or first two reissues before the third reissue patent was issued.

The defendants offered in evidence 26 prior patents but relied only on the following patents: Patent No. 597,000 to Higbee, referred to on page 1 of the specification in the second paragraph of the later Higbee patent next to be cited, and was therefore in the record. Patent No. 658,087 to Higbee, cited by the Patent Office during the prosecution of the application which matured into the reissue patent in suit. Patent No. 1,316,969 to Nichols, cited by the Patent Office in the prosecution of the application which matured into reissue patent No. 17,528, which was reissued into the reissue patent in suit. Patent No. 105,200 to Allison, not cited in the Patent Office. Patent No. 1,007,068 to Cornelius, not cited in the Patent Office.

The first patent to Higbee, No. 597,000, issued January 11, 1898, is for a screw union or coupling, and the patentee stated in his specification the object of his invention to be as follows: "The object of my invention is to increase the tightness of the joint formed between the male and female members of the coupling, so as to adapt such unions for use in pipes or chambers of any description where gas or liquid is contained under pressure and for which uses screw-joints have heretofore been found unsatisfactory or defective." Page 1, lines 15 to 22.

The second patent to Higbee, No. 658,087, issued September 18, 1900, is for screw coupling, and is stated by the patentee to be for an "Improvement in Screw Couplings."

The object of the invention is stated by the patentee in his specification to be as follows: "My invention relates to screw-couplings of the general character described and shown in my prior patent, No. 597,000, of January 11, 1898, the object of my invention being to provide a coupling of this character in which the form of the threads will be especially advantageous; and my invention consists in providing a screw-coupling in which one member has its thread formed upon a conical surface, and the other member its thread formed upon either a cylindrical or conical surface, preferably less inclined than the other, with threads the sides of which are angular and the tops and bottoms of which are squared, the tops being considerably broader than the bottoms and the corners, where the squared tops and bottoms intersect the angular sides, being preferably slightly rounded." Page 1, lines 11 to 28.

Both of these patents are concerned with pipe joints or screw union for pipes or chambers where gas or liquid is contained under pressure, made so strong that they will not burst even under great pressure.

In both patents dependence is placed upon the shape of the threads, which are made in such a way that the metal will flow during the screwing movement to form a very strong joint.

In the earlier Higbee patent the male and female threads are rounded off at the apices. In the later Higbee patent the apices and bottoms of the threaded grooves are rounded off with a substantially similar effect.

The object of the patent in suit is the direct opposite of the purposes of the Higbee devices.

The patent in suit is for a specific article of manufacture, a clean-out plug in which the connection between the plug and ferrule, while being tight, is not permanent, and the plug is not prevented from being unscrewed.

Higbee does not even suggest the combination of the excessive plug taper with the standard pipe thread taper of the fitting, whereby only a fractional portion of the plug engages the fitting. These patents do state that the male threads may be on the surface of a cone of somewhat greater angular divergence than the cone of the female threads, but the purpose of that is to have a particularly tight engagement of some of the threads.

All the threads of the male member engage in the threads of the female member of the devices of Higbee, the divergence being so slight as not to permit any threads to be out of engagement. In the patent in suit, on the contrary, the plug will fit openings of varying sizes, and in each case only a few threads will engage.

No screw connection could be made in the devices of the Higbee patents if the female threaded surface was larger or varied, and there could be no tight screw-joint as appar-

ently intended, as is necessary for pipes containing fluid or gases under pressure. In Higbee patent No. 597,000 the taper of the male portion A is so slightly greater than the taper of the conical portion B, that if the conical portion B were of somewhat greater diameter, no engagement could be made. The difference in taper in the Higbee is not, as in the patent in suit, to permit the plug to fit openings of varying sizes, but as some of the threads at one end are slightly oversize, and have greater pressure than other threads, the purpose is, as the drawings show, to have all threads in engagement, the threads of the male member pressed out of shape due to the powerful engagement of the threads.

The Nichols patent, No. 1,316,969, issued September 23, 1919, is for a tight-joint cover, and discloses a cover having inner and outer annular flanges 17 and 19, receiving therebetween the upper edge 13 of the trap or member 10. The upper edge 13 is formed with an inner cylindrical threaded surface coacting with the outer threads of the inner flange 19. The threads on the portion 19 are on a slightly beveled surface to permit the cover to be started by hand easily.

The objects of the invention were stated by the patentee in his specification as follows:

"The object of my invention is to provide a tight joint cover for traps or bath tubs, clean-out pipes, waste line pipes and the like, which does not require packing.

"More particularly it is my object to provide a tight joint cover whereby a metal to metal tight joint can be secured, thereby doing away with the use of rubber or other non-metallic gaskets.

"A further object is to provide such a tight joint cover comprising a cylindrical wall having in its upper end interior screw-threaded portions, in connection with a cover having an external flange, and a downwardly extending inwardly spaced internally screw-threaded flange, the upper surface of which is beveled on an angle slightly different from that of the inner surface of the screw-threaded portion of the wall, so that when the cover is screwed into the wall, the upper edge of the wall will be firmly gripped between the two flanges." Page 1, lines 8 to 30.

And further says: "The outer surface of the flange 19 is slightly beveled from top to bottom so as to permit the cover to be started by hand easily." Page 1, lines 67 to 70.

As the cover is screwed onto the upper end portion 13, said upper end portion is tightly wedged between the flanges 17 and 19; therefore if the opening of the flange or edge portion 13 were larger, there would be no wedging action.

The Nichols drawing is exaggerated, as the specification says that the bevel of the flange 19 is slight and merely for the purpose of permitting the threads to be started easily by hand. All the threads will engage, and the slight taper will not permit the cover to be used with openings of larger or smaller size. It is the intention of Nichols that each time the cover is screwed on, the upper edge 13 must be forced into the groove formed by the two flanges 17 and 19, so as to be tightly wedged and pressed against the said flanges.

The Nichols patent shows nothing indicating that the patentee had in mind or contemplated the use of his flanged cover with openings of various sizes. The problem he was attempting to solve was not the problem which confronted the patentees of the patent in suit.

The Allison patent, No. 105,290, for improvement in pipe couplings, issued July 12, 1870.

The patentee in his specification states the nature and object of his invention as follows:

"My invention consists of a coupling in which tapering and vanishing screw-threads on the ends of the tubes, pipes, or rods to be coupled together, are combined with a socket, having internal vanishing and tapering screw-threads, corresponding to those on the tubes, rods, &c.

"The object of my invention is to effect a more perfect and secure junction of tubes, &c. than has been heretofore accomplished by screw-couplings." Page 1, lines 7 to 15.

Fig. 2 of the Allison patent does not embody his invention, but illustrates the ordinary method of coupling pipes together at that time which Allison sought to displace. It does not show the combination of a tapered plug and a tapered opening.

Fig. 3 shows the Allison invention, which consists in cutting the screw threads so that they shall gradually vanish until the thread disappears.

This is not what is called for by claim 6 of the patent in suit, in which a "plug having a tapered threaded outer surface, and a tapered threaded inner surface receiving said plug," is required.

The problem which confronted Allison was quite different from that which the patentees of the patent in suit solved.

To solve their particular problem the patentees of the patent in suit conceived the idea

of providing a plug of which only a fractional part engaged the fittings, while in Allison no threads are entirely out of engagement.

Allison says in his specification: "It has been usual to cut a slightly tapering screw on the ends of the adjoining tubes, while an internal screw-thread, without any taper, was formed in the socket; hence but a portion of this internal thread of the socket was in proper binding contact with the threads of the pipes, as clearly shown in Fig. 2, the greater portion of the threads, both on the tubes and in the socket, being of no avail as mediums for effecting a tight junction of the two tubes. This defect which is too clearly explained by the diagram, Fig. 2 to need further explanation. * * * "

This clearly shows that while Fig. 2, for the purpose of exaggerating the defect Allison seeks to remedy, shows some threads not in contact, what he intends to show is that these threads do not have "a proper binding contact with the threads of the pipes."

The remedy is shown in Fig. 3 by Allison's invention, his "disappearing threads."

The Cornelius patent, No. 1,007,068, for valve-seating tool, issued October 31, 1911. This patent is not for a plug of any kind but is for a valve-seating tool. No member having an opening is disclosed, and it does not cover the combination of a tapered clean-out plug and a drain fitting having a tapered threaded opening to which the plug is screwed. The members 4 and 5 of Cornelius are screwed to each other as at 4a, on two cylindrical threaded surfaces. The member 4 is formed with a cylindrical opening slidably receiving the stem 1 of a tool for reaming or dressing valve seats. The Cornelius patent has nothing to do with clean-out plugs or drainage fittings, and does not show or even indicate that the members 4 or 5 are used or intended to be used with a drainage fitting, having a tapered threaded opening of a taper less than the taper of said members.

The members 4 and 5 are not really screwed into any member, but only make a kind of detachable connection therewith to center the tool, and as soon as the reaming operation is over, a slight turn will release members 4 or 5 from the member.

The Durst Catalog: The defendants not being prepared to prove this catalog or its publication, permission was given to the defendants to take a deposition for this purpose.

The deposition of Mr. Redlich was taken, and he testified that he was the secretary of the Durst Manufacturing Company since

1912, and that he had in his possession the catalog, Defendants' Exhibit H, at his office before 1920. The witness fixed the date from recollection and there is no corroboration of his testimony. Objection was made by plaintiff to the admission of this catalog in evidence, on the ground that the same is incompetent and not properly proved.

There was no proof that the catalog was ever circulated or distributed to the public, and the mere fact that it is a printed catalog which was in possession of the Durst Company is not sufficient. Britton v. White Manufacturing Co. (C. C.) 61 F. 93, 95; Reeves v. Keystone Bridge Co., 20 Fed. Cas. page 466, No. 11,660; Camp Bros. & Co. v. Portable Wagon Dump & Elevator Co. (C. C. A.) 251 F. 603; Jockmus v. Leviton (C. C. A.) 28 F.(2d) 812, 814; Thacher v. Inhabitants of Town of Falmouth (D. C.) 235 F. 151; Cottier v. Stimson (C. C.) 20 F. 906, 910.

The objection of the plaintiff is sustained, with exception to the defendants.

However, if I am in error in sustaining plaintiff's objection, and it be assumed but not found that the catalog Defendants' Exhibit H is a prior printed publication, the same does not anticipate plaintiff's patent.

On page 19 of the catalog there is shown a bath cock having a conical tapered screw thread, with no description of the device except the following: "Fits any size bath cock." There is no explanation as to how the device is to be used, nor to what type of screw threaded opening the bath cock is to be screwed, and to be effective prior publications must substantially furnish such details as are necessary for the practical working of the alleged invention. Young Radiator Co. v. Modine Mfg. Co. (C. C. A.) 55 F.(2d) 545; Union Tool Co. v. Wilson & Willard Mfg. Co. (D. C.) 237 F. 837; Linde Air Products Co. v. Morse Dry Dock & Repair Co. (C. C. A.) 246 F. 834.

I find nothing in the catalog which anticipates the patent in suit, which is for a combination of a drainage plug and a drainage fitting, the taper of the plug being defined as being substantially greater than the taper of the opening of the drainage fitting.

At page 10 of the same catalog there is disclosed a reamer, but it does not disclose anything which is not shown in the Cornelius patent, and does not add anything thereto.

An examination of the prior art leads me to the conclusion that nothing in the prior art shows a device intended or conceived for the same purpose as that of the patented plugs,

nor does it appear in any of the prior art that the prior inventors even considered or had in mind the problem solved by the patentees.

None of the prior patents nor the Durst Catalog can be considered as anticipations. National Battery Co. v. Richardson Co. (C. C. A.) 63 F.(2d) 289.

Defendants further contend that by reason of the cancellation of the claims after rejection by the Patent Office, plaintiff is estopped to make claims 6 and 7.

This contention is not sustained.

Claim 3 as originally presented and canceled by the patentees after rejection by the Patent Office was more specific than claim 3 of the first reissue patent No. 17,528, and of entirely different scope.

Claim 3 of the reissue patent No. 17,528 defines the plug as being rust-proof, whereas in claim 3 as originally presented in the patentees' original application there is no such limitation.

Furthermore, claim 3 of the reissue patent defines the plug as having approximately the same number of teeth as the opening. There is no such limitation in claim 3 as originally presented. Claim 3 of the said reissue patent is for a combination, rust-proof clean-out plug and threaded drainage fittings of various sizes, while claim 3 as originally presented is for a combination of a body having an opening and a member fitting into the opening.

Claim 6 as originally presented and canceled by the patentees after rejection by the Patent Office is of different scope than claims 6 and 7 of the reissue patent in suit. These claims set forth, in the reissue patent in suit, that the taper of the plug is so sufficiently greater or different from the taper of the threaded opening, that only a fractional section of the plug will engage with the opening, and the plug will fit similar threaded drainage openings of various sizes. There are no such limitations in the canceled claim 6 as originally presented in the patentees' original application. Nowhere in the original claim 6 is it stated that the taper of the plug is so sufficiently greater that only a section of the plug will engage the threads of the openings, and that the plug will fit openings of various sizes.

Defendants also attack the claims in suit as being indefinite; but I see no merit therein, as I find the claims accurately define the invention in clear language that any one versed in the art can understand, and that is shown by the structure of the defendants. Claims in which terms such as "high," "substantial," "substantial elevation," "high elevation," "rapidly," and "substantially smaller" were included have been sustained. Eibel Process Co. v. Paper Co., 261 U. S. 45, 65, 43 S. Ct. 322, 67 L. Ed. 523; Eibel Process Co. v. Remington-Martin Co. (C. C. A.) 234 F. 624; and Hewes & Potter, Inc., v. Meyerson (D. C.) 51 F.(2d) 405.

The elements of novelty and utility are present in the patent in suit.

The patentees solved their problem by invention and not simply by their acts as skilled mechanics, and this is apparent as the art had been faced by this problem for nearly fifty years, and yet no one had solved it by following the teaching of the prior art. Inland Mfg. Co. v. American Wood Rim Co. (C. C. A.) 14 F.(2d) 657, 659.

Viewed in the light of knowledge after the event, the invention may be considered simple, but that does not detract from its patentability. Yawman & Erbe Mfg. Co. v. Vetter Desk Works (C. C. A.) 159 F. 443, 445; Dececo Co. v. George E. Gilchrist Co. (C. C. A.) 125 F. 293, 298; A. Kimball Co. v. Noesting Pin Ticket Co. (C. C. A.) 262 F. 148, 150; Webster Loom Co. v. Higgins, 105 U. S. 580, 591, 26 L. Ed. 1177; Bray v. United States Net & Twine Co. (C. C.) 70 F. 1006, 1007; Lane v. Craftsmen Film Laboratories, Inc. (C. C. A.) 7 F.(2d) 288; Bossert Electric Const. Co. v. Pratt Chuck Co. (C. C. A.) 179 F. 385; Hewes & Potter, Inc., v. Meyerson, supra; O. K. Jelks & Son v. Tom Huston Peanut Co. (C. C. A.) 52 F.(2d) 4; Sheridan v. Silver-Brown Co. (D. C.) 4 F. Supp. 759.

Claims 6 and 7 of the patent in suit are valid and infringed.

### As to Unfair Competition.

This cause of action was pleaded separately and in aggravation of damages.

The plugs put out by the defendants, while they infringe, differ in appearance from plaintiff's commercial structure.

The names Fit-All and Takall do not impress me as being so similar that they would deceive, and no evidence was offered to show that there had been any confusion in the trade, or that the defendants had attempted to palm off their plugs bearing the mark Takall for that of the plaintiff.

Registration of plaintiff's trade-mark under the Trade-Mark Act of 1905 (15 USCA § 81 et seq.) did not give it in this country

any effect as a source of title or as evidence thereof.

Unfair competition was not sustained either as a separate cause of action or in aggravation of damages, and that cause of action is dismissed, without costs.

A decree may be entered in favor of the plaintiff against the defendants, in accordance with this opinion, with injunction, costs, and the usual order of reference, and in favor of the defendants dismissing the cause of action for unfair competition, and also the charge thereof in aggravation of damages, without costs.

Settle decree on notice.

Submit proposed findings of fact.